And may it please the court, I'd like to address two issues in the Haddon matter today. One is the invocation of silence, and the other is the PGM and the court's ruling below that not allowing us to amend into the petition a series of PGM-related claims. With regard to the invocation of silence, it's our position that this Court should grant relief or, in the alternative, remand for an evidentiary hearing. The background facts with regard to the invocation, on March 25, 1987, two Nevada law enforcement officers arrested Mr. Lowy, if I heard you correctly, you're focusing on relief from the alternative ruling. Yes? I'm seeking relief or, in the alternative, that is, merits relief, or in the alternative judge, a remand for an evidentiary hearing. Well, I mean, I guess my question would be, the judge's ruling in the alternative was in the alternative to his principal ruling, which was that the record was not developed with due diligence. Correct. Stateside. So if that ruling stands, then the alternative ruling is just in the air. Very well. I understand the point, Judge. I don't think that that ruling should stand, and I'll be addressing that along the way. To go back to the background facts regarding the invocation, on March 25, Mr. Lowy was arrested inside the 4-Way Casino in Wells, Nevada, a town of about 1,200 residents, by two Nevada officers. He was taken out in handcuffs from the casino, no resistance, placed over the back side of a trunk of a car, and within minutes, two more Nevada officers, together with three law enforcement officers from Idaho, arrived on the scene. Mr. Lowy was Mirandized. He was placed in the back seat of a Wells City police car, and joined there by Detective Shaw, one of the Idaho officers, and they proceeded a few blocks to the Wells City Police Department, where Mr. Lowy was put in a belly chain, was put on Mr. Lowy's, and ankle bracelets were put on Mr. Lowy's, and a decision was made to move to the local Nevada Highway Patrol substation for lack of security at the local police station. During that short car ride, Detective Shaw asked Mr. Roge a question about an Idaho Falls lingerie shop burglary, for which he had a warrant, and Mr. Roge responded, ah, bullshit, I don't want to talk about it. A short time later, they arrived at the Nevada Highway Patrol substation, where Mr. Roge and the seven officers were in a room, a small room, according to Detective Rodriguez, and in that custodial environment, Detective Shaw remarked to Mr. Roge that if he, Shaw, had arrested Roge earlier for the burglary, three people might be alive today. And there's variations. Three victims might be alive, three people. Mr. Roge allegedly said, I did it, and Detective Shaw allegedly went on and identified each of those victims in one way or another, to which Mr. Roge, in one line, said, I did it again, allegedly. It's our position that I'm saying, ah, bullshit, I don't want to talk about it, en route from the city police station to the substation, Nevada Highway Patrol substation, and Mr. Roge invoked his right to silence. The statement is, if anything clearer than that, which this court held was an invocation of one's right to silence in Anderson v. Terhoon, where the statement was, I plead the fifth. This statement, on its face, says, I don't want to talk about it. Although the statement was in response to a question about the burglary, right? That is correct. It was. And just as the burglary was invoked in the question at the Nevada Highway Patrol substation, if I had arrested you earlier for the burglary, three victims would be alive. So it was not an interrogation, or the functional equivalent of an interrogation, which was a wholly separate inquiry under, for example, as it was in Mosley. The district court, our position is, erred in finding that we did not exercise due diligence, or the defense did not exercise due diligence in finding this information out. The district court found that, quote, Petitioner has not shown beyond his conclusory statement that his counsel lacked access to the information which was contained in a please report before the Michelbacher trial, unquote. But the record shows that counsel did not have access to the information. Three days after being arraigned, Rhodes filed a discovery request seeking, and I'm quoting, the substance of any relevant oral statement made by the defendant, whether before or after arrest to a peace officer, prosecuting agent, excuse me, prosecuting attorney, or his agent, unquote. After conducting a hearing on the matter, the trial court entered a written order specifically directing the prosecution to comply with this discovery request, and specifying, among other things, that particular request in paragraph one, which I had just quoted. At a pretrial discovery conference in April of 1987, defense counsel made abundantly clear, and it was transcribed, that he was seeking each and every written and oral statement by Mr. Rhodes. Yeah, Mr. Lowy, in response to that statement, which you certainly made, the prosecutor said, look, other than the statement that's in the Shaw police report, I don't think that there are any other statements. So the report was called to counsel's attention at that discovery conference.  And the prosecutor thought he had it, in which case he should have said, if he didn't have it, you know what, I haven't seen that, or followed up on it later. Well, I'm not sure I'm following you, Judge. The that, in this case, was perhaps something that the prosecutor did not know at that point. This was an April 1987 conference. There was absolutely no testimony at the preliminary hearing in the Nickelbacher matter, which was traveling with the Hadden matter at that point. They had not yet been severed. And there was no testimony about the second statement, that is, the Nevada Highway Patrol substation statement, until July. So it seems unlikely that the prosecuting attorney was himself aware of it in any event. We have in the record, as well, deposition testimony from Mr. Hart, as well as Mr. Radin, trial counsel, indicating that they did not have the report, that they have no memory of having the report, and didn't see it. We think that the gloss that the district court put on Mr. Radin's deposition testimony does not support its conclusions. The deposition testimony of Mr. Radin, just as the deposition testimony or the affidavit of Mr. Hart, which the district court relies on, is not testimony in which the attorneys are saying, I did miss it, and the reason I missed it was the volume of paper. It's much more, if I missed it, then. It's a hypothetical. It's not, they're not buying into the conclusion, which the district court is jumping to. And for those reasons, there is at least a question in the record. We have made a colorable showing. There are conflicting affidavits. This court has held that you cannot decide, issue a fact, a question of fact, based on affidavits. And for that reason, there should be an evidentiary hearing in this case on the question of whether, in fact, due diligence was exercised in finding this report. The district court ruled in the alternative that, ah, bullshit, I don't want to talk about it, even if that were considered, Mr. Rhodes would still not be entitled to relief. And the court reasoned that the statement was at most ambiguous or equivocal. It was an ambiguous or equivocal reference to his right to silence with respect to the unrelated burglary. But again, I cite to Anderson v. Terhune, the ah, bullshit, I don't want to talk about it, is an even more clear, obvious indication of one's right to silence. And if we're going to consider the context of the words, the statement itself, we need to consider the entire context. Counsel, I'm not sure it's so obvious that it's a clearer invocation than the Anderson case, because it is in response to a question at that time about the burglary. And the, also the, ah, the statement made by Mr. Rhodes after the part you quoted, I think he went on to say, get the cuffs off. So it might be, ah, interpreted as ambiguous as to whether he just didn't want to talk at that time about that subject. Well, perhaps about that subject, and perhaps the invocation, ah, was not an invocation about I don't want to talk about anything. Ah, and it was merely an invocation about I don't want to talk about the burglary. The questioning, however, in this context, where the distance between in time, because of physical space, was very short between the point at which that invocation was made, and the point at which Detective Shaw continued the questioning in the police substation. The questioning here did not stop and then get re-initiated. The questioning continued. So it seems to me, and frankly, even if there was a stop and then re-initiation, even if that is how we analyze this, the amount of time between that was so short that it clearly does not meet the standards of Moseley, where there was a two-hour or two-hour-plus stop and then re-initiation. And while there have been cases where there have been shorter amounts of time, none of those cases involve periods of time such as this, where we're talking a mere matter of a few minutes. And what is the significance of the Supreme Court's precedent that a request for counsel in response to the Miranda warnings has to be unequivocal? Well, first, of course, there's a question of whether that does have impact in this area, which is an invocation of silence, of course. That's what I'm asking you to address. Right. And I'm aware that other circuits have gone in the direction they've gone, which is to say that they've held that it does need to be unequivocal. However, here, it is unequivocal. I don't want to talk about it. It's our position, an unequivocal invocation of one's right to silence. It may be an unequivocal invocation of one's right to silence as to the burglary, but our position then is if that's the case, it still is a violation of Moseley because the other factors come into play as well. Okay. Thank you. If we are to consider the context, the very context that you're talking about, Judge Gould, about the language context, I think we also need to consider the context, the larger context, which includes the fact that this is a Nevada arrest, and there are a total of seven officers there for what is a lingerie shop burglary, including four from, excuse me, three from the state of Idaho. Now, one might, if one is stopped on a highway, by analogy, and an officer comes up to the side of your car and asks for your license and registration, think that one is being stopped for speeding, perhaps, or a bad light, a bad tail light. However, if you are stopped by a police officer on the highway and you see a police officer on the left side of your car approaching, a police officer on the right side of your car approaching, and guns drawn, you're probably not thinking that this is a mere traffic stop for speeding or a bum tail light. And my suggestion is that there is a very analogous thing going on with the context here. That is, Mr. Rhodes was very likely not thinking, and no reasonable person would think, that where you have seven police officers arresting you, three who have traveled from out of state, that they're arresting you on a burglary warrant. Resources just don't get spent that way. Counsel, you have no more than five minutes left. I have just, in fact, I appreciate you reminding me of that. In fact, I was just about to say I'm going to stop and reserve the rest for rebuttal. Okay. Thanks. Thank you. That doesn't want to stay. May it please the court. There are two certified issues in this case. Both of them, of course, involving the rather infamous second I did it statement. The first, of course, involves the expansion of the record. And that's critical in this case because this is an AEDPA case. And Rhodes has not met his burden of establishing due diligence. As Judge Reimer indicated, there was information very early on at the discovery conference regarding Detective Shaw's report, which should have clued counsel that perhaps he didn't have all of the reports. But more importantly, the statement is based upon something that Rhodes himself said. Rhodes was present when he made the statement. It is simply unfathomable to me that there could be a finding that Rhodes exercised due diligence in raising a claim literally years after the fact based upon a statement that he himself made. I have a very, very, very difficult time with that. Counsel, I mean, as I understand the argument, it was that he's doped up or drugged up or alcoholed up, and he may not remember everything he said. Now, on the other side, there was the fact of the three bills and the cop saying it's $3 and him saying it better be $111. So was any factual decision ever made about this, or should there be an evidentiary hearing on whether he could remember this statement? There was a factual finding made both by the trial court and by the Idaho Supreme Court, not with regards to his level of intoxication at the time that he actually made the statement in the police car, but certainly his level of intoxication at the casino and after the transport at the substation. And that finding was that his mental capacity was not overcome by the level of intoxication. There's no question that he was intoxicated. I think every witness that testified at the preliminary hearing, the suppression hearing, and trial as far as police officers discussed his level of intoxication. But additionally, every single police officer that testified also said that he was able to understand what was going on irrespective of his level of intoxication. And not only do we have the search that was conducted by Detective Shaw, where, as you mentioned, Judge Gould, Detective Shaw actually wanted to test Rhodes' ability to understand what was going on by saying, yeah, there's only $3 here and Rhodes says there better be $111. But there was an incident inside the casino when he was arrested. I believe it was Officer Shires. I'm not 100% sure. I don't recall exactly who arrested. But Rhodes was sitting at a blackjack table and had money riding on a game. And Rhodes was cognizant enough of what was going on to say, I want the money from that game. Now, I don't know if it was the $111 that was later found in his pocket or not, but he knew that he had money riding on the game. He knew he was playing blackjack. He knew what was going on. And there's simply no evidence to the contrary that he, yes, he was intoxicated, but that intoxication did not overcome his ability to voluntarily make these statements and know exactly what was going on. He was coherent. According to Detective Rodriguez, Shires said he was intoxicated, but not to a degree where he could not understand what was going on around him. And as I said, the trial court's finding, and I will quote it, the essence of the testimony presented was that Rhodes did indeed appear to be under the influence of alcohol or drugs. However, all witnesses who expressed opinions testified Rhodes appeared to understand and comprehend the situation on the evening of his arrest. And that finding has not been rebutted by clear and convincing evidence, even under pre-AEDPA law. And, of course, this particular case is pre-AEDPA. As to the question of Davis and whether this was an equivocal statement or not, the real question in this case is Rhodes' statement was, I'm not going to talk about it. The question is, what was the it he was not going to talk about? And if you look at everything that took place in that car prior to his making that statement, it was focused exclusively upon the lingerie burglary. Rhodes hadn't even been apprised, at least there's no evidence in the record to suggest, that Rhodes had even been apprised that he was a suspect in any murder case, let alone was potentially going to be arrested regarding any murder case. It was exclusively the burglary case. On top of that, and... How do you answer Mr. Lowy's argument that given the show of force and number of police, that he would necessarily know there was a murder concern afoot? But the test here, if Davis is extended, is not Rhodes' frame of mind, but whether a reasonable officer would believe that Rhodes' statement was somehow equivocal. And under the circumstances, based upon what was taking place at that moment, a reasonable officer would believe that Rhodes, if he was invoking at all, he was invoking as to the burglary. How many circuits have ruled on whether the Davis principle should be extended to other Miranda rights apart from the right to counsel? Judge Gould, I can't remember the exact number. I've cited at least I believe it's three in our brief. And I know that this circuit has, at least last time I checked, has declined to address that specific issue. But, you know, I'm not even sure that Davis has to be expanded. Because if you look at the precedent of this circuit, you can invoke as a defendant selectively. Rhodes was certainly permitted to invoke as to the burglary. There was no requirement that he invoke as to the murder. Additionally, Rhodes was permitted to consider, and I said burglary twice, didn't I, the murder. Additionally, Rhodes was permitted under that doctrine to determine the time and the place that he was going to talk. Rhodes, as you mentioned, Judge Gould, after he said that he wasn't going to talk about it, and I'm failing to find it outside of the police report, he said get these blanking cuffs off of me. And, of course, there was a fair amount of discussion even prior to him invoking between Rhodes and Detective Shaw about the crammed conditions of the car. Rhodes wasn't happy being in there. Rhodes is a big man. Shaw is a big man. And he wasn't happy. And certainly it could be presumed that when Rhodes invoked, he wasn't even invoking as to the burglary. He was invoking as to the time that he wanted to talk. He didn't want to talk right then because it was crammed. He had his hands presumably behind his back, cuffed, at least cuffed. The record doesn't state if it was behind or in front, but cuffed. And he was an unhappy individual at that time. And he is permitted under, I believe it's both Miranda and Mosley, to dictate the time, the place, and the subject matter of any interrogation. And he did that. So there was simply no problem in regards to the I did it statement. And I think that I've pretty well discussed why this case is not the Anderson case. Because the question is really what is it and why? Why did he invoke? And the why was because he didn't want to be in the back of that car, handcuffed, and in the position that he was. There's certainly no indication that he wasn't willing to talk once they got out of the car. As to, very quickly, the motion to amend, which counsel did mention, of course, this is not a certified issue. And I would submit to the court that there's not even a basis to grant COA on this. Rhodes, of course, attempted to amend his petition very, very late in the proceedings with three new claims, all based upon two things, the FBI's 1987 PGM testing report and a new expert's affidavit. What is critical to this case is that that claim would have failed for a multitude of reasons. Number one, under the AEDPA, it was filed beyond the statute of limitations. And, of course, those three claims are not tied to a common core of operative facts that allow them to relate back. Secondly, it was procedurally defaulted, all three claims. Now, the court didn't get to that. And I realize that's from the district court. I realize that because the court went on and said it's barred by the statute of limitations. But the claim fails on its face. Rhodes had the 1987 FBI report before the Michelbacher trial. Michelbacher was tried before he pled guilty in Baldwin. Simply has. And he had an expert that, at least based upon the testimony that we have or the record that we have. You just said Baldwin. Did you mean Haddon? Well, he pled guilty in this case after, excuse me, after the Michelbacher trial. He pled guilty in Haddon. He didn't plead guilty in Baldwin. Thank you. Thank you, Your Honor. He pled guilty in Baldwin. No. He pled guilty in Haddon. Correct. And I apologize. He did not plead guilty in Baldwin. That was the Bingham County case. He pled guilty in this case, the Haddon case, after he had been tried in the other two cases. And he had an expert forensics person by the name of Dr. Fox who was provided the FBI report. Now, I don't know what Dr. Hampikian, I know of him. But if that report, that FBI report on its face, establishes that Rhodes was not the contributor of the semen in Michelbacher's, in Susan's mouth, it sure went over their expert, Dr. Fox. On top of that, what in the world does the semen in Susan Michelbacher's mouth have to do with this case, the Haddon case? Absolutely nothing. There was no semen found in this case. There was actually very little forensic evidence in this case, in the Haddon case, that tied Rhodes to this case. The bottom line is that this motion to amend was properly denied because it was untimely and there was not a scintilla, not a scintilla of substance to it in this, the Haddon case. Unless there are additional questions for the court, from the court, we'd ask the court to affirm the district court. Thank you. I have none. Judge Reimer? Judge Bybee? No, thank you. No questions. Mr. Lowy gets his rebuttal argument now. Thank you, Judge. Judge Gould, as you noted, Mr. Rhodes' claim, of course, is that he drugged up, alcoholed up, substanced up. The fact that there was a finding regarding Mr. Rhodes' mental capacity at the time, of course, does not go to the question of Mr. Rhodes' subsequent ability to remember what was going on at the time. So, all those findings. Is there anything in the record that would suggest that he couldn't remember? Yes. The affidavit suggests that. I'm sorry, Judge? Yeah, go ahead. The affidavit. The record certainly shows that he was under the influence. Yes, it does. There's no question about that. But is there anything in the record that speaks at all to his memory? The only thing I can recall from the record that speaks to his memory is his own declaration submitted, you know, recently in the Federal habeas petitions, which actually refers to something that he said or did or observed at the time, which suggests to me that he remembers fine if he wants to. No, Judge. I think there's a few things which actually go to the question of his memory that are in the record. Number one is a declaration to the amount of drugs that he was taking leading up to the day of his arrest. And that's in an affidavit submitted in the cases for the suppression motion. Does anybody say that, express any kind of an opinion that that would consequentially cause memory loss? I don't know whether it does or doesn't. Well, in addition to that, there is, if one reads the testimony of the various officers and reads them with an eye to the timeline through the evening, one sees that Mr. Rhodes is getting increasingly under the influence, which is certainly consistent with the affidavit stating that he took a whole lot of drugs just before his arrest. In fact, immediately after his Nevada Highway Patrol substation statement, he goes to sleep or whatever one does when one has taken a whole lot of drugs. The suggestion, Judge, is that there is an impact on memory for those who are that deeply under the influence. There is no expert declaration in the record, Judge. You're correct. With regard to, and I should also note in this regard going to the memory, there's also a doctor's report in the record. It's in the IAC profit and penalty phase from Dr. Gummer. There's also testimony talking about Mr. Rhodes as not being really human on the night of his arrest, whereas he was in the officer's terms human a couple days later when he sees him at the county lockup in Nevada. Opposing counsel notes that the real question here is what is the it in a statement, I don't want to talk about it. My suggestion is, as I made in my initial argument, is that what is the it really doesn't matter because of the continuation of the interrogation. Or again, if it's not continuous interrogation, it was so close in time that the it just doesn't matter. Whatever the indication was to, whatever subject it was to, it carries forward under Mosley and under the factors in Mosley. I should note also that this court has held that re-Mirandizing is the key factor when doing Mosley analysis. Mr. Rhodes was not re-Mirandized before the interrogation at the Nevada Highway Substation. Counsel, you have 30 seconds. I'm wondering if you could address one question that was raised by Mr. Anderson, and that is an argument that you didn't reach, which is the motion to amend on the unsubstantiated question. Yes. And can you explain to us what relevance the evidence in the Mickelbocker case would have for having it? Yes, thank you very much, Judge. I was just getting to that. The relevance is exactly this. The plea was not just a guilty plea, it was an Alford plea. And Mr. Rhodes was quite clear that it was an Alford plea. He was not admitting guilt. But for the guilty verdict in Mickelbocker, he would not have entered an Alford plea in this case. And because of the misconduct in the Mickelbocker matter with regard to the PGM, there would not have been, it's our position, a guilty verdict. Whether Mr. Rhodes, by the way, had the FBI report or not in 1987 under this court's ruling in Belmontes is really quite irrelevant for prosecutorial misconduct analysis. Prosecutorial misconduct analysis springs from an independent source than ineffective assistance of counsel, which I assume is what opposing counsel was alluding to. It springs from, of course, the duty of the prosecuting attorney to the court and to the jury not to mislead. And that's exactly what occurred here by failing to bring out the FBI result. Now, the analogy that I think is best when thinking about the PGM is this. If you can analogize it to street crime and drug sales, the cops on the street do a field test, but there's a confirmatory test by the lab. If the confirmatory test says it's not actually coke, it's not crack, the case gets kicked out. The state's test here was very much the field test. There's no question that the FBI was a more refined test. It should have been kicked out. We're about a minute and a half past your limit. I've got 133 on my clock, but I see it's going up. It's not going down. Thank you, Judge. I apologize. No, Judge Bivey asked you a question, and you should answer it. Judge Bivey, if you had your question. The answer to my satisfaction, yes. Okay, then we'll let you rest up for the next argument.
judges: Rymer, Gould, Bybee